HUMPHREY, D.B.A HUMPHREY HOMES, APPELLANT, *v.* THE STATE OF OHIO, DEPARTMENT OF MENTAL HEALTH AND MENTAL RETARDATION, APPELLEE.

(No. 82AP-1057—Decided
February 7, 1984.)

*Michael F. Colley Co., L.P.A.,* and
Mr. *Frank A. Ray,* for appellant.

Mr. *Anthony J. Celebrezze, Jr.,* attorney general, and Mr. *John P. Gilligan,* for appellee.

STRAUSBAUGH, J. Plaintiff-appellant, Myrtle J. Humphrey, d.b.a. Humphrey Homes, brings this appeal from a judgment of the Court of Claims in favor of defendant-appellee, Ohio Department of Mental Health and Mental Retardation. Humphrey Homes is a sole proprietorship which provides residential care and training for mentally retarded and developmentally disabled adolescents through the operation of three group homes: Argosy I, Argosy II and Argosy III. All three of the plaintiff's facilities were properly licensed to provide such services.

On July 21, 1978, the plaintiff entered into three separate contracts with the defendant to provide residential care and training at each of its three facilities to eligible clients certified by the defendant. The plaintiff was compensated by a per diem payment rate established in accordance with the provisions of the contract and state regulations concerning service contracts. The per diem rate was determined by calculating the amount of expenses incurred daily for the care and training of each eligible client. Expenditures for approved services in the prior year were used for the calculations, along with a ninety percent occupancy figure. During fiscal year 1979 (from July 1, 1978 to June 30, 1979), the plaintiff operated below ninety percent capacity and was reimbursed by the defendant only for those clients actually cared for.

On June 6, 1979, the plaintiff entered into a new contract with the defendant to commence on July 1, 1979. This single contract covered all three of the plaintiff's group homes for a period extending from July 1, 1979 to August 31, 1979. The contract was subsequently extended to June 30, 1980 and the plaintiff was again compensated according to the established per diem rate. As in fiscal year 1979, Humphrey Homes operated below ninety percent capacity and was compensated only for the number of persons actually cared for.

On July 1, 1981, the plaintiff filed a complaint against the defendant for breach of contract. The plaintiff claimed that the defendant was under a contractual obligation, both during fiscal year 1979 and 1980, to insure that all three of the plaintiff's facilities were operating at a ninety percent occupancy level and to reimburse the plaintiff for those expenses incurred in providing the services needed to maintain that level of capacity. As a result of the defendant's alleged breach, the plaintiff claims that she sustained damages in the amount of $81,909.63. The plaintiff's action was tried in the Court of Claims on October 6, 1982 and, on November 16, 1982, the court rendered a decision in favor of the defendant dismissing the plaintiff's complaint. From this decision the plaintiff now brings this appeal. We shall first consider plaintiff's fifth assignment of error wherein she states:

"5. When a continuous practice between parties to a contract reveals that payments are not made when due without complaint, it is improper as [a] matter of law to conclude that the applicable statute of limitations begins to accrue at the date of the first missed payment."

In its decision the trial court concluded as a matter of law:

"2. That plaintiff's claim for $39,089.27 for FY 1979 services, not

rendered in any event by any contract in evidence prior to October 1, 1978, fails to state a claim upon which relief can be granted. Said alleged claim for relief arose more than two years prior to July 1, 1981 the date the complaint was filed."

The plaintiff asserts that the trial court's decision is in error and that the statute of limitations could not have accrued on or before June 30, 1979, because the payments owed under the fiscal year 1979 contracts were not yet due. It is the plaintiff's position that there was evidence presented that a "continuous practice" had developed during the relationship of the parties whereby the plaintiff accepted several late payments from the defendant.

This practice extended beyond the expiration date of the contract; therefore, the plaintiff asserts that, because of this "custom" or "usage" of accepting late payments, a breach in the contracts did not occur at the exact date specified for the contracts to end, but did occur when a reasonable time had passed for the last payment to be due. R.C. 2743.16 reads as follows:

"Civil actions against the state permitted by sections 2743.01 to 2743.20 of the Revised Code shall be commenced no later than two years after the date of accrual of the cause of action * * *."

The plaintiff cites *Thomas* v. *Guarantee Title & Trust Co.* (1910), 81 Ohio St. 432, for the proposition that a "continuous practice," like a "usage" or "custom," can be used to explain or aid in the interpretation of a contract. However, as stated in *Thomas,* evidence of a "custom" or "usage" between the parties may not be considered when the intended meaning of the contract is clear. Only when the meaning of the contract as expressed in writing is doubtful may such evidence be considered. It may not be used to vary the express terms of a contract or to vary its legal import. In each of the three contracts signed by the

plaintiff for fiscal year 1979, payments were required to be made every fourteen days. Therefore, notwithstanding the delayed payments, the terms of the contracts between the plaintiff and defendant, in regard to when each payment was due, were clear and unambiguous. Evidence of "custom" or "usage" cannot be considered to vary those terms.

Assuming, however, that it was a "continuous practice" of the plaintiff to accept delayed payments from the defendant, such action would constitute a waiver of the time requirements found in the fiscal year 1979 contracts thereby nullifying any breach of contract claim for failure to fully reimburse the plaintiff by the expiration date of the contracts. Nevertheless, the plaintiff's cause of action for breach of the fiscal year 1979 contracts was properly barred by the two-year statute of limitations. The plaintiff seeks recovery based upon the contention that the defendant failed to provide the plaintiff with a sufficient number of clients to reach a ninety percent occupancy level and to fully reimburse the plaintiff for services provided to help maintain that level. The plaintiff's claim for relief is not based upon the defendant's failure to reimburse her in accordance with the payment schedule set forth in the contracts. When the contracts expired, on June 30, 1979, any duty on the part of the defendant to allegedly guarantee a ninety percent occupancy level also expired. Therefore, the plaintiff's fifth assignment of error is overruled.

In her first assignment of error the plaintiff states:

"1. The Court of Claims erred by concluding that the contract period commenced on October 1, 1978, rather than July 1, 1978 because where conflicting clauses exist in a written contract, proper interpretation must be gleaned from the object of the instrument. Thus, the Court erred in failing to award Ap-

pellant compensation as claimed for that period."

In light of our discussion concerning the plaintiff's fifth assignment of error, any claim based upon the contracts executed between the plaintiff and the defendant in July 1978 is barred by the two-year statute of limitations in R.C. 2743.16. Any question concerning the commencement date of those contracts is therefore moot. Accordingly, the plaintiff's first assignment of error is overruled.

The plaintiff's second assignment of error reads as follows:

"2. Where the main issue of the case is breach of Appellee's payment obligation under a contract, the trial court erred by admitted [sic] extraneous and irrelevant information, which served to confuse the issues and as to which probative value was substantially outweighed by improperly prejudicial impact against Appellant."

Plaintiff claims that the trial court erred in allowing evidence concerning the physical condition of the group homes to be admitted and considered by the court. The plaintiff bases this assignment of error on the ground that such evidence was totally irrelevant as to the defendant's obligation to fully reimburse her under the terms of its agreement; that, even if it is relevant, it was extremely prejudicial to the plaintiff; and that it should have been excluded under Evid. R. 403.

As stated by the Supreme Court in *O'Brien* v. *Angley* (1980), 63 Ohio St. 2d 159, at 163 [17 O.O.3d 98]:

"* * * [W]hen the trial court determines that certain evidence will be admitted or excluded from trial, it is well established that the order or ruling of the court will not be reversed unless there has been a clear and prejudicial abuse of discretion. * * *"

Evid. R. 104(A) states:

"Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or *the admissibility of evidence shall be determined by the court * * *.*" (Emphasis added.)

Under the terms of the fiscal year 1980 contract, the plaintiff agreed to meet all standards required for residential care, training and treatment of mentally retarded and developmentally disabled individuals and all other statutory licensing and certification regulations required by the state. As part of her case in chief, the plaintiff presented evidence through her direct testimony that all the requirements that appeared in the contracts had been complied with substantially. It was proper for the trial court to allow the admission of evidence presented by the defendant concerning the substandard condition of her three group homes, both as a means of discrediting her previous testimony and as a means of rebutting her claim that all contractual requirements had been met. The trial court did not abuse its discretion in determining that such evidence was relevant to a resolution of plaintiff's claim. It could not reasonably have been concluded that the plaintiff would still be entitled to the payments she sought if she had failed to abide by the terms of the contract.

Even though such evidence is certainly prejudicial to the plaintiff, the trial court did not abuse its discretion in determining, pursuant to Evid. R. 403, that its probative value clearly outweighed any prejudices it created. Therefore, the plaintiff's second assignment of error is overruled.

The plaintiff's third assignment of error states:

"3. The trial court erred by requiring Appellant, as a witness at trial, to testify with respect to conclusions of law."

During her cross-examination, Humphrey was allowed to testify as to whether or not she thought that she had complied with specific provisions of the

contract. In choosing this line of questioning, counsel for the defendant was in effect asking the witness to give her interpretation of the language of the contract and to state whether or not her conduct was consistent with that interpretation. However, while the trial court erred in allowing her to testify in such a manner, the plaintiff has failed to show how she was prejudiced by such testimony.

On direct examination, the trial court allowed the plaintiff to testify in a similar fashion to questions offered by her counsel over the objections of the defendant. When asked again on cross-examination to relate her conduct to the provisions in the contract, the trial court allowed her to answer on direct examination, citing its earlier ruling in regard to the plaintiff's testimony. The court stated in pertinent part:

"THE COURT   Well, * * * then we may be here all day tomorrow too, but * * *. Do I have an objection to * * * the general line of questioning, is that what I've got?

"MR. RAY   You do, Your Honor, because it's getting to that point where we're going to ask this witness to tell us what the words mean in the con * * * it's gotten to that point. We're asking the witness to interpret the contract. That's inappropriate. That doesn't happen in courts.

"THE COURT   Well, I kind of thought that was what you were asking her this morning.

"MR. RAY   It certainly was not.

"THE COURT   Well, that * * * you may say it wasn't but it seems to me like it's the same thing. Whether she complied with the terms of the contract and went down from 'A' to 'J' or 'I', whatever it was and * * *. I'm going to overrule the objection. If it takes three (3) days, why that's how long we're going to take, so, * * * I overrule the objection."

Accordingly, no prejudical error has been established and the plaintiff's third assignment of error is overruled.

The plaintiff's fourth assignment of error reads as follows:

"4.   The trial court erred when it failed to admit into evidence a policy statement not attached to a written contract to explain the vagueness of the obligations of the parties under the contract when it does not vary the terms of the written contract and, considering this and all other evidence the Court thereupon erred as a matter of law by failing to find that Appellant was entitled to payment as claimed."

In regard to the policy statement for fiscal year 1979 submitted by the plaintiff, the record reveals that, contrary to the plaintiff's contention, the policy was admitted into evidence by the trial court, and, therefore, its admission need not be discussed.

In addition, the plaintiff asserts that the trial court erred in concluding that the ninety percent occupancy figure found in the policy statement was used only to calculate the per diem rate of reimbursement and did not require the defendant to maintain a ninety percent occupancy level in the plaintiff's group homes. The policy statement issued by the Division of Mental Retardation and Developmental Disabilities states in pertinent part:

"Contracts shall be written for *a specified number of clients at a specified per diem rate* which is calculated *on the basis of the prior year's actual expenditures for services which are approvable in FY 1979,* and *on the basis of not less than 90% occupancy* of the licensed capacity * * *." (Emphasis added.)

After reviewing the contracts and record of the proceedings at trial, it is clear that there is nothing in the provision of the contract that would indicate that the defendant had guaranteed a ninety percent occupancy to the plaintiff. Indeed, such a significant and substantial obligation, if truly intended

by the parties, would have been more clearly set forth in the language of the contract. *Alexander* v. *Buckeye Pipe Line Co.* (1978), 53 Ohio St. 2d 241 [7 O.O.3d 403]. Nowhere in the language of the agreement does such a promise or guarantee appear. The ninety percent occupancy figure appears only in the policy statement issued by the Division of Mental Retardation and Developmental Disabilities and was clearly intended to be used only in determining the per diem rate of reimbursement. Again, nothing in the per diem calculations would indicate that the defendant is required to guarantee that the plaintiff's facilities will be maintained at a ninety percent occupancy level. The ninety percent figure is used to calculate how much the plaintiff will be required to expend in relation to each client cared for. A basic fee is then established to determine the amount that should be reimbursed for services rendered in the care, rehabilitation and training of each client who was actually a resident in the plaintiff's facilities. Accordingly, the defendant was not obligated, under the provisions of the contract or the language of the department policy status, to provide the plaintiff with enough clients to maintain a ninety percent occupancy level.

The plaintiff's fourth assignment of error is overruled, and the judgment of the trial court is affirmed.

*Judgment affirmed.*

REILLY and MOYER, JJ., concur.