**The STATE of Ohio, Appellee,**

v.

**WILLIAMS, Appellant.**

[Cite as *State v. Williams* (1992), 80 Ohio App.3d 648.]

Court of Appeals of Ohio,
Lorain County.

Nos. 91CA005118, 91CA005119.

Decided May 20, 1992.

*Gregory A. White,* Prosecuting Attorney, for appellee.

*Hollace B. Weizel,* for appellant.

---

REECE, Judge.

On September 3, 1990, James Riffle was fatally stabbed fourteen times in his Elyria apartment. Defendant-appellant, Willie Williams, Jr., was indicted on October 2, 1990 in the Lorain County Court of Common Pleas for Riffle's murder. After a seven-day jury trial, Williams was found guilty on May 9, 1991 of aggravated murder and aggravated robbery. The jurors thereafter found that mitigating factors outweighed the aggravating circumstances and did not recommend the death penalty. On May 23, 1991, Williams was sentenced to life imprisonment. He has perfected the instant appeal advancing seven assignments of error. Plaintiff-appellee, the state of Ohio, was granted conditional leave by this court to cross-appeal.

## *Williams' Appeal*

Williams' assignments of error have been rearranged and consolidated to facilitate discussion.

## Assignment of Error I

"The trial court erred to the prejudice of appellant, and in violation of O.R.C. section 2945.35, when over the objection of appellant, it permitted jurors to take notes during testimony and to take the notes into the jury room during deliberations."

Despite repeated objections by the defense, the trial judge advised the jurors at the outset of the trial that they were free to take notes. Williams argues that the court erred by allowing such.

It has been observed in the past that one of the potential hazards of note taking is that jurors may be distracted from the evidence and witnesses. See *Corbin v. Cleveland* (1944), 144 Ohio St. 32, 34–35, 28 O.O. 562, 563, 56 N.E.2d 214, 214–215. The rule in this district and elsewhere in Ohio, nevertheless, is that a trial court has the discretion to permit jurors to take notes if warranted under the circumstances. *State v. Garrison* (Mar. 25, 1987), Summit App. No. 12676, unreported, at 7–8, 1987 WL 8477; see, also, *State v. Jones* (1988), 50 Ohio App.3d 40, 42, 552 N.E.2d 651, 653. Reversible error exists only if the court acts unreasonably, arbitrarily, or unconscionably. *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 172, 404 N.E.2d 144, 148.

An abuse of discretion may be found when note taking is permitted during routine and uncomplicated proceedings. See *State v. Shifflett* (Nov. 12, 1987), Wayne App. No. 2269, unreported, at 2-4, 1987 WL 19979; *State v. Williams* (Oct. 7, 1991), Stark App. No. CA-8274, unreported, 1991 WL 242075. Quite the contrary situation is presented in the case *sub judice*. Prior to the capital trial, it was readily apparent that numerous witnesses, including experts, would testify on a range of complex issues. The trial judge had every reason to believe that the proceedings would become extremely protracted. The decision to allow note taking was therefore justified.

Nor does the record reveal any reason to believe that Williams suffered undue prejudice as a result of juror note taking. Before the first witness was produced, the jury was cautioned that:

"I permit Jurors in this Court to take notes during the trial if they want to, and to have their notes with them during deliberations.

"I want to emphasize that none of you are required to take notes. Indeed, you should not do so if you think that note taking might distract your attention from the evidence or the testimony of the witnesses in the case. On the other hand, if you think that taking notes might better focus your attention on the witnesses and the evidence, or might better help you to recall what went on during the trial, you may feel free to take notes.

"You should remember that your notes only are intended to be a help to your memory. They should not take precedence over your own independent recollection of the evidence. [Moreover], those Jurors who do not take notes should rely on their own memory of the evidence and should not be influenced by the fact that another Juror has taken notes, since the notes only are for the notetaker's personal use in refreshing his or her memory of the evidence.

"Whenever there is a recess in the trial, please leave your notebooks and pencils on your seats. They will be left there during short recesses when I remain on the bench or the Courtroom is locked. And they will be collected during overnight recesses and given to me to keep. At no time during or after the trial will anyone, including myself, look at any of your notes. At the end of the trial, after you have finished your deliberations, I will ask that each of you tear out your notes from your notebook and give them to your Foreperson. In turn, I will ask the Foreperson to give me your notes, and I will destroy them immediately after the return of your verdict. Again, neither I nor anyone else will look at any notes you have taken."

These admonishments were repeated prior to deliberations. Williams has failed to defeat the general presumption that the jury faithfully followed the instructions supplied by the court. *State v. Dunkins* (1983), 10 Ohio App.3d 72, 73, 10 OBR 82, 83, 460 N.E.2d 688, 690.

■ There is no merit to Williams' further suggestion that the jurors' notes should have been preserved for review rather than destroyed. Quite clearly, he has no more right to examine these writings than he does to interrogate the jurors about their verdict. The notations are personal to the jurors and will not be laid open for inspection and debate.

■ Finally, we do not agree that the trial court violated R.C. 2945.35 by allowing the jurors to refer to their notes during deliberations. That provision states:

"Upon retiring for deliberation, the jury, at the discretion of the court, may take with it all papers except depositions, and all articles, photographs, and maps which have been offered in evidence. No article or paper identified but not admitted in evidence shall be taken by the jury upon its retirement."

In *State v. Graven* (1977), 52 Ohio St.2d 112, 6 O.O.3d 334, 369 N.E.2d 1205, the appellant argued that sending the indictment to the jury room transgressed R.C. 2945.35, since the statute did not expressly mention such material. The Supreme Court responded that:

"This statute by its express language authorizes the trial court, within its discretion, to permit the jury to take with it papers upon retiring for deliberation, except those papers identified but not admitted in evidence. To read the statute literally, as proposed by appellant, would exclude from the jury room written charges as expressly authorized for jury use by R.C. 2945.10, as well as verdict forms, note paper, balloting paper, pens, etc. The obvious purpose of the statute is the exclusion from the jury room of that evidence which has been ruled inadmissible." *Id.* at 113, 6 O.O.3d at 335, 369 N.E.2d at 206.

In similar fashion, we conclude that R.C. 2945.35 has no application to the jurors' notes, since these writings were never offered into evidence or ruled inadmissible.

This assignment of error is not well taken.

### Assignment of Error II

"The trial court erred to the prejudice of appellant, and in violation of the Sixth and Fourteenth Amendments to the Constitution of the United States and Article I, Section 10 of the Ohio Constitution, when it refused to allow appellant's expert to present an opinion within the expert's expertise."

In rebuttal, Williams presented Donald Nittskoff, a self-professed "forensic scientist and toxicologist." As his background was primarily in chemistry, he was permitted to render an expert opinion upon the reliability of a urine analysis performed by the state. He was not allowed to testify on anything

further. In a proffer, Nittskoff opined that Riffle's injuries were consistent with Williams' theory of self-defense. Williams maintains that the court erred by prohibiting this inquiry.

Given his superior vantage, the trial judge enjoys broad discretion in the admission and exclusion of evidence and will not be reversed absent a clear abuse which has materially prejudiced the defendant. *State v. Hymore* (1967), 9 Ohio St.2d 122, 128, 38 O.O.2d 298, 302, 224 N.E.2d 126, 130; *Humphrey v. State* (1984), 14 Ohio App.3d 15, 18, 14 OBR 18, 21, 469 N.E.2d 981, 985. Such deference is particularly appropriate upon the determination of whether a witness is qualified to render an expert opinion. *State v. Maupin* (1975), 42 Ohio St.2d 473, 479, 71 O.O.2d 485, 488, 330 N.E.2d 708, 713; *State v. Thomas* (1991), 63 Ohio App.3d 501, 503, 579 N.E.2d 290, 291.

Evid.R. 702 requires that an expert possess sufficient "knowledge, skill, experience, training, or education" in the specific field to be discussed. Nittskoff maintained that he had once attended a seminar on "stabbing wounds" and taught introductory courses at Lakeland Community College and Cuyahoga County College on "criminalistics." Nittskoff claimed that he had previously testified at least twice with respect to body wounds. He admitted, however, that he had no actual medical school training and had never attended an autopsy.

Under these circumstances, we do not agree that the trial court was obliged to recognize Nittskoff as an expert on weapon/wound analysis. His knowledge in this specific field was, by all appearances, limited. The claim that he had been so qualified in previous trials is a factor to be considered but is by no means controlling. It is significant that the trial judge rejected a similar request by the prosecution to qualify a police detective as an expert on the same subject. His credentials were at least as extensive as Nittskoff's, albeit of a different nature.

This assignment of error is overruled.

## Assignment of Error VI

"The trial court erred to the prejudice of appellant, and in violation of Crim.R. 29(A), Article I, Section 10 of the Ohio Constitution, and the Fourteenth Amendment to the Constitution of the United States, when it denied appellant's motion for acquittal."

At various points in the trial, Williams sought a directed verdict pursuant to Crim.R. 29. These attempts proved unsuccessful.

It is fundamental that the state must prove every necessary element of the crime charged. *In re Winship* (1970), 397 U.S. 358, 364, 90 S.Ct. 1068,

1072, 25 L.Ed.2d 368, 375. After viewing the evidence in the light most favorable to the prosecution, this court must ask whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia* (1979), 443 U.S. 307, 318–319, 99 S.Ct. 2781, 2788–2789, 61 L.Ed.2d 560, 573–574; see, also, *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

At Williams' trial, his co-worker, Douglas Decker, testified that Williams owed him money. On Sunday, September 2, 1990, Williams told Decker he could repay him if he would take him to Riffle's apartment. Decker dropped Williams off there at about 4:00 a.m. and then watched Williams peer through Riffle's window. Decker then left and went home. He recalled that Williams was wearing a white sweatshirt and white sweatpants that night.

A few hours later, a neighbor of Riffle's, Jill Armstrong, observed a young black man with a white sweatsuit sitting on the stoop outside the building. He was gone by about 9:00 a.m.

The next day was Labor Day. Armstrong explained that she arrived at the apartment complex at about 7:30 p.m., after spending the afternoon with her fiance. Riffle pulled in at the same time and entered the building alone, carrying nothing but a jacket. Armstrong grabbed some bags and followed him inside approximately a minute and a half later.

When she entered the hallway, another neighbor, Darrell Martin, was standing outside Riffle's apartment banging on the door and yelling, "What is going on in there?" A male voice inside was shouting, "Help me, please help me, they're stabbing me." Pounding was heard against the door. Armstrong called the police and then returned to Riffle's apartment but heard nothing. Martin took the stand after Armstrong and recited the same version of events.

A third neighbor, Dennis Huebner, also heard the screams. He explained to the jurors that he ran to his balcony and witnessed a black man in a dark blue sweatsuit with red stripes climbing out of Riffle's window and carrying a duffel bag. The individual fled across the lawn toward a residential area.

Detective John Glover of the Elyria Police Department, who also testified, was off duty at this time. He was at his home approximately a block and a half from Riffle's apartment. While at his refrigerator, Detective Glover noticed Williams walking hurriedly through his yard and past his house. Suspicious, Detective Glover grabbed his gun and jumped in his car. He soon located Williams and told him to halt. Williams was wearing sweatpants with a red stripe on each side and a black shirt. He dropped a duffel bag he was carrying and fled. Detective Glover retrieved the bag and radioed in a report.

Officer Darrell Mayne of the Elyria Police Department testified that he responded to the call at Riffle's apartment with another officer. Riffle's door was unlocked, allowing the two men to push it open. Riffle's lifeless body was slumped against it. There was blood all over the entranceway, in the living room, and on the curtains by the window. Williams' palm print was found on the window. A note was also discovered, which an expert determined was most likely written by Williams.

The duffel bag recovered by Detective Glover from Williams had Riffle's name on it. It contained, among other things, a white sweatshirt, white sweatpants, a bank of pennies, a clock radio, a watch, and a ring.

Sergeant Lynn Robinson explained that he assisted in the ensuing hunt for Williams. In the early evening of September 4, 1990, two youths gave him Riffle's wallet. They had found it in Tom Peters' yard. When Peters was approached, he indicated that Williams was in his house. Williams was then seized and arrested. Jogging pants, tennis shoes, and a knife were found under some nearby bushes. Once in custody, Williams admitted that he had stabbed Riffle.

The Lorain County Coroner, Robert Thomas, M.D., told the jury that while Riffle was stabbed fourteen times, he died from a wound directly to his heart. Knife wounds were also found in his forehead, left ear, back of the neck, mid portion of the back, back left shoulder, upper arm, and chest cavity. Dr. Thomas testified that several of them required "a substantial amount of force." A number of bite marks were discovered on the body. Elizabeth Robinson, D.D.S., confirmed that the imprints were most likely made by Williams.

Construed in a light most favorable to the prosecution, this testimony permits a logical determination beyond all reasonable doubt that Williams inflicted serious harm upon Riffle while perpetrating a theft offense. R.C. 2911.01(A)(2) (aggravated robbery). Furthermore, the prosecution's evidence was sufficient to sustain a finding that Williams purposely killed Riffle while committing this crime. R.C. 2903.01(B) (aggravated murder).

Citing *State v. Ballard* (1984), 14 Ohio App.3d 59, 14 OBR 64, 469 N.E.2d 1334, Williams notes that the offense of aggravated robbery requires that the infliction of serious physical harm occur "simultaneously" with the theft offense. He argues that he attacked Riffle in self-defense and not in furtherance of any crime. His departure with Riffle's belongings, we are assured, was unrelated to the stabbing. This reasoning depends, however, upon a complete acceptance of the defense testimony and a concomitant rejection of the prosecution's case. Such a view of the evidence is impermissi-

ble for purposes of a directed verdict. *State v. Wolfe* (1988), 51 Ohio App.3d 215, 216, 555 N.E.2d 689, 690.

In similar fashion, Williams insists that a conviction for aggravated murder was legally foreclosed by his declaration on the witness stand that he did not "purposely" kill Riffle. The evidence presented by the prosecution strongly inferred that he did.[1] Consequently, the trial judge properly denied the Crim.R. 29 motion and allowed the jury to decide the issue. See *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 9 O.O.3d 401, 381 N.E.2d 184, syllabus.

This assignment of error is overruled.

### Assignment of Error VII

"The trial court erred to the prejudice of appellant, when it entered judgment of conviction, where such judgment was against the manifest weight of the evidence."

Our standard of review is well established:

"In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Otten* (1986), 33 Ohio App.3d 339, 340, 515 N.E.2d 1009, 1010; see, also, *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 218, 485 N.E.2d 717, 720.

This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. *Otten, supra,* 33 Ohio App.3d at 340, 515 N.E.2d at 1010; *Martin, supra,* 20 Ohio App.3d at 175, 20 OBR at 218, 485 N.E.2d at 720.

In an attempt to establish that the jury somehow lost its way, Williams highlights various isolated portions of the transcript where prosecution witnesses supposedly contradicted each other. The "discrepancies" all concern relatively minor matters such as precisely what articles Riffle carried with him when he entered the building. The more incriminating evidence presented by the prosecution was uncontested: Williams' motive for the theft, his presence at the apartment, the cries for help from inside, Riffle's brutal

---

1. It is axiomatic that criminal intent need not be proved directly but may be "gathered from the surrounding facts and circumstances." *State v. Huffman* (1936), 131 Ohio St. 27, 5 O.O. 325, 1 N.E.2d 313, paragraph four of the syllabus.

death, Williams' flight with belongings of the victim, and Williams' day-long evasion of police.

Williams did not challenge these facts but maintained instead that he killed Riffle in self-defense. Under his version of the events, Riffle welched on a deal to buy him $200 worth of marijuana. He went to Riffle's apartment building on September 3, 1990, as he had the night before, and waited for him in the hallway. Riffle appeared carrying bags and clothes. Riffle let him inside and became agitated that Williams was pressing him for the money. Riffle then went out to his truck and returned with shoes and a jacket. He allowed Williams to use his duffel bag to carry the extra white jogging suit he had with him.

. Williams claimed that Riffle suddenly came at him with a pipe. At work, Riffle had supposedly referred to the instrument as his "nigger beater." A fight ensued with Riffle yelling obscenities and racial epithets. Riffle "grazed" Williams with the pipe, prompting Williams to bite him on the hand. Riffle managed to work himself behind Williams and began choking him with the pipe. Williams tried to open the door to flee, but Riffle kept banging him against it while repeatedly declaring his intention to kill him. Williams bit him again.

Williams then grabbed a nearby knife and asked Riffle to release him. When Riffle did not desist, Williams reached around and "stabbed him one time into the side." Williams continued, knifing him until Riffle let go. In a panic, Williams grabbed the duffel bag and a few other items—ostensibly as payment for the $200—and fled through the window.

On cross-examination, Williams conceded that his trial testimony differed substantially from a statement he had given police earlier. At that time, he maintained that Riffle attempted to "push" him out the door with the pipe on the "back" of his neck. He further proclaimed that he had stabbed Riffle "maybe 3 times." The coroner testified for the state that Riffle's wounds were inconsistent with Williams' explanation of the attack. At some points, the knife had been thrust so deeply into Riffle's body that it penetrated bone and cartilage.

Nothing in the record indicates that intelligent jurors would be obliged to accept Williams' rendition of the events leading to Riffle's death. The mere fact that some of Williams' statements coincided with prosecution testimony and exhibits hardly necessitates that he had to be believed unconditionally. The jury was entitled to, and apparently did, find the state's evidence supporting the crimes charged to be more convincing.

This assignment of error has no merit.

### Assignments of Error III and IV

"III. The trial court erred to the prejudice of appellant, and in violation of O.R.C. section 2903.01(D), the Fourteenth Amendment to the Constitution of the United States, and Article I, Section 10 of the Ohio Constitution, when it instructed the jury on purpose and cause.

"IV. The trial court erred to the prejudice of appellant, and in violation of Crim.R. 52(B), when it instructed the jury on the offenses of aggravated robbery and voluntary manslaughter."

 Although Williams raises a number of complaints concerning the jury charge, none of these contentions was presented to the trial judge. Consequently, these matters are considered waived. *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus. The orderly administration of justice demands that errors first be addressed at a time when they can be remedied. *State v. Mahoney* (Oct. 9, 1991), Lorain App. No. 90CA004957, unreported, at 5, 1991 WL 208429. Moreover, parties must not be permitted to secret away errors during trial with the intention of raising them later on appeal if an adverse judgment is received. *Adams v. State* (1874), 25 Ohio St. 584, 587–588; *Mahoney, supra*, at 5.

 We cannot agree, furthermore, that the plain error exception to this rule applies under these circumstances. Crim.R. 52(B). Such will not be recognized unless, "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. Since we have already held that sufficient evidence was presented by the prosecution on each element of the crimes charged to allow reasonable minds to return convictions, it logically follows that the jury could still reach the same result even if instructed as Williams suggests. Absent the supposed mistakes in the charge, an acquittal is still not necessarily warranted given the facts of this case.

These assignments of error lack merit.

### Assignment of Error V

"Appellant was denied effective assistance of counsel, in violation of the Sixth and Fourteenth Amendments to the Constitution of the United States and Article I, Section 10 of the Ohio Constitution, when trial counsel failed to object to the trial court's instructions on purpose, cause, aggravated robbery, and voluntary manslaughter."

Williams has been appointed new counsel for this appeal. The standard for determining whether his prior attorney prevented the completion of a fair trial

was set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693:

" * * * First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. * * *" See, also, *State v. Seiber* (1990), 56 Ohio St.3d 4, 11, 564 N.E.2d 408, 417.

A strong presumption exists that licensed attorneys are competent and that the challenged action is the product of a sound trial strategy. *Strickland, supra,* 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694; *State v. Thompson* (1987), 33 Ohio St.3d 1, 10–11, 514 N.E.2d 407, 416–417.

We can find no mistakes in the charge so serious as to call into question the constitutional validity of Williams' trial. Similar allegations to this court, and surely other tribunals as well, have become routine. The clear import of *Strickland* and its progeny is that not every error in omission or commission, whether inadvertent or intentional trial strategy, constitutes ineffective assistance of counsel. The Sixth Amendment to the United States Constitution guarantees only a fair trial, not a perfect one.

In this case, the balance of the evidence against Williams was overwhelming. Having examined the jury instructions as a whole, we are convinced that the modifications proposed by Williams' new counsel would not result in a different verdict. All things considered, we conclude that his trial was sufficiently "reliable" to withstand constitutional muster.

This assignment of error is also overruled.

### State's Cross–Appeal

In an entry dated August 13, 1991, this court granted the state leave to cross-appeal by authority of R.C. 2945.67(A) and App.R. 5(A) provided Williams first prevailed in his appeal. Since all of Williams' assignments of error have been overruled, the cross-appeal will not be considered. See *State v. Dotson* (1986), 31 Ohio App.3d 199, 31 OBR 468, 510 N.E.2d 815.

### Conclusion

The judgment of the court of common pleas is affirmed.

*Judgment affirmed.*

BAIRD, P.J., and QUILLIN, J., concur.