**AKRON–CANTON WASTE OIL, INC. et al., Appellees,**

**v.**

**SAFETY–KLEEN OIL SERVICES, INC. et al., Appellants.**

[Cite as *Akron–Canton Waste Oil, Inc. v. Safety–Kleen
Oil Serv., Inc.* (1992), 81 Ohio App.3d 591.]

Court of Appeals of Ohio,
Summit County.

Nos. 15230, 15298.

Decided July 1, 1992.

594

*James Recupero* and *William J. Cody,* for appellees.

*Elizabeth B. Manning,* for appellants.

———————

Reece, Judge.

Defendants-appellants, Safety–Kleen Oil Services, Inc., George Kaiser, Richard Duke (collectively "Safety–Kleen") and K–Mart Corporation ("K–Mart"), challenge the Summit County Court of Common Pleas' entry of judgment in favor of plaintiffs-appellees, Akron–Canton Waste Oil Company, Inc. and Fred Ambach (collectively "Akron–Canton Waste"), upon claims of defamation, tortious interference with business relations, unfair trade practices, and negligent and intentional infliction of emotional distress. Between them, Safety–Kleen and K–Mart have raised thirteen assignments of error.

The basic, background facts are not in dispute. Safety–Kleen and Akron–Canton Waste were competitors in the local waste oil market. Both enterprises collected used oil generated by garages, auto dealers, and lube shops to be resold to re-refiners and burners. The business was extremely competitive.

On December 8, 1987, an employee of a local Firestone automotive service center filed a theft report with the Akron Police Department. This individual alleged that someone named "Fred" of "Akron–Canton Waste Oil" took an unknown amount of waste oil from underground storage tanks. Soon thereafter, a Safety–Kleen agent was instructed by his depot manager to obtain a copy of the police report.

Fred Ambach ("Ambach"), the owner and operator of Akron–Canton Waste, came to believe that copies of the police report were being distributed to his customers by Safety–Kleen. He contacted the manager at Firestone and convinced him that the complaint should not have been filed. The Firestone manager had the report declared unfounded. Ambach's attorney then dispatched a letter to Safety–Kleen on December 31, 1987, demanding that the distribution of defamatory material cease. The area manager for the corporation, George Kaiser ("Kaiser"), received the correspondence and mailed a copy to the home office.

On August 18, 1988, Ambach stopped at the New Philadelphia K–Mart automotive service station to inquire whether he could collect any used waste oil to top off his load. A mechanic directed him to where the oil was stored and Ambach proceeded to pump two-hundred gallons into his truck. A K–Mart assistant manager, Christopher Gunner ("Gunner"), signed a receipt for the service.

The next day, the K–Mart loss prevention manager, Margaret Smith ("Smith"), learned that Akron–Canton Waste had collected the service department's used oil instead of the regular hauler. Upon the instructions of her district manager, she interviewed several employees and filed a complaint by phone with the New Philadelphia Police Department. Smith alleged that someone operating an Akron–Canton Waste truck had taken K–Mart oil without permission. She then prepared an investigation report, which was forwarded to her district manager.

Copies of both the police and investigation reports were sent to Kaiser at Safety–Kleen's request. Safety–Kleen employees thereafter distributed the K–Mart documents as well as the unfounded Firestone report to potential customers as part of their sales pitch. Ambach soon learned of this activity and was angered.

On August 21, 1989, Akron–Canton Waste filed its complaint against Safety–Kleen and K–Mart. An eight-day jury trial was conducted in June 1991 and a verdict was returned in favor of Akron–Canton Waste. A judgment was accordingly entered by the court on June 25, 1991. K–Mart was ordered to pay $23,750 in compensatory damages, while Safety–Kleen was assessed $251,250 in compensatory plus $300,000 in punitive damages.

■ This appeal by Safety–Kleen and K–Mart follows. The various assignments of error have been rearranged and consolidated where appropriate.

### Safety–Kleen Assignment of Error II

"The court committed prejudicial error as a matter of law by permitting the lay witness opinion testimony of an ex-employee on the ultimate issue of the intention of the corporate defendant."

A former Safety–Kleen employee, Robin Johnston ("Johnston"), testified on behalf of Akron–Canton Waste. As a secretary, she performed a variety of duties in the Medina office and was in contact with the managers and corporate employees. Johnston claimed that she basically ran the facility during her two years there.

Johnston testified that one of her responsibilities was to take phone calls from customers who were concerned that their waste oil was missing. Because hazardous waste generators may be liable for the illegal dumping of their refuse, Johnston would advise them to file police reports to protect themselves. She had been instructed by her superiors at Safety–Kleen to request copies of any complaints that were lodged with the authorities. Anytime a police report involving stolen waste oil was received, Johnston would distribute copies to the Safety–Kleen drivers. The former secretary

charged, over objection, that the intention of Safety–Kleen was to discredit its competitors.

 Safety–Kleen contends on appeal that this damaging disclosure should not have been permitted. Given its superior vantage, the trial court enjoys broad discretion in the admission and exclusion of evidence and will not be reversed absent a clear abuse which has materially prejudiced an objecting party. *State v. Hymore* (1967), 9 Ohio St.2d 122, 128, 38 O.O.2d 298, 302, 224 N.E.2d 126, 130, certiorari denied (1968), 390 U.S. 1024, 88 S.Ct. 1409, 20 L.Ed.2d 281; *Humphrey v. State* (1984), 14 Ohio App.3d 15, 18, 14 OBR 18, 21, 469 N.E.2d 981, 985. An abuse of discretion connotes more than an error of law or judgment as it implies the court's attitude was unreasonable, arbitrary, or unconscionable. *Steiner v. Custer* (1940), 137 Ohio St. 448, 451, 19 O.O. 148, 149, 31 N.E.2d 855, 856; *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 172, 404 N.E.2d 144, 148.

Citing *Mitroff v. Xomox Corp.* (C.A.6, 1986), 797 F.2d 271, Safety–Kleen argues that lay witnesses must never be allowed to render an opinion as to a corporation's intentions. The federal court's holding fell well short of the absolute prohibition Safety–Kleen advances. In *Mitroff,* the plaintiff was permitted by the district court judge to testify that an assistant personnel manager had told him that the employer-defendant routinely engaged in "age discrimination." The appeals court held that the plaintiff's remarks were inadmissible hearsay and, in any event, the comments attributed to the manager constituted improper legal conclusions which could be of no assistance to the jury. *Id.* at 276–277.

In the case *sub judice*, Johnston's testimony was based upon her own personal knowledge and did not constitute hearsay. Evid.R. 801(C). Additionally, the trial judge did not abuse his discretion by allowing her lay opinion concerning Safety–Kleen's intentions. Evid.R. 701 provides:

"If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue."

Johnston explained that her opinion was based upon her observations of and dealings with her superiors, Kaiser and Bruce McFadden. Her description of her job duties also allowed an inference that she would be in a position to know the reasons for the various practices of the corporation. We cannot dispute the trial judge's conclusion that Johnston's testimony as to Safety–Kleen's intentions would be helpful to the jury. Consequently, no abuse of discretion occurred. *Steiner, supra.*

Safety–Kleen further complains that its own witness, Kaiser, was not permitted to explain why he gave copies of the K–Mart police and investigation reports to customers. In the passage cited, however, the trial judge simply refused to allow Kaiser to discuss his supposedly altruistic motivations *in general* until he could pinpoint the dates and customers he was referring to. The defense was afforded ample opportunity through the course of the trial to establish why a waste oil generator would need to know if another collector was engaging in illegal activity.

This assignment of error is overruled.

### Safety–Kleen Assignment of Error V

"The trial court committed prejudicial error as a matter of law in allowing the jury to award damages for tortious interference with contract and unfair trade practices in the absence of any evidence of actual loss or damage."

This court recognized the common-law tort of business interference in *Juhasz v. Quik Shops, Inc.* (1977), 55 Ohio App.2d 51, 9 O.O.3d 216, 379 N.E.2d 235. In *Walter v. Murphy* (1988), 61 Ohio App.3d 553, 573 N.E.2d 678, we modified the required analysis to conform with 4 Restatement of the Law 2d, Torts (1979) 20, Section 766B. That provision declares:

"One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of

"(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

"(b) preventing the other from acquiring or continuing the prospective relation."

■ The term "contractual relation" includes not only formal agreements but encompasses advantageous business transactions in general. *Id.*, Comment *c*.

The General Assembly has also supplied a civil remedy in R.C. 4165.03 for those "injured by a deceptive trade practice of another." R.C. 4165.02 states that:

"A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he:

" * * *

"(H) Disparages the goods, services, or business of another by false representation of fact[.]"

This statutory enactment does not supplant the common-law tort. *Id.*

Ambach explained at trial that when collecting waste oil, he relied more upon impromptu solicitations of local generators than formal arrangements. Safety–Kleen argues as a result that no cause of action can be sustained for either intentional business interference or deceptive trade practices absent a "firm," "certain," and "well established" commercial relationship with an identified third party. Presumably, we are asked to hold that the majority of small businesses which serve the general public on a "day to day, first-come, first-serve" basis are not protected under these theories of law.

As already noted, the common-law right of action protects *all* advantageous business relations, real or potential, from improper interference. See 45 American Jurisprudence 2d (1969) 285, Interference, Section 7. A legally binding agreement is not a prerequisite to recovery. *Pacific Gas & Elec. Co. v. Bear Stearns & Co.* (1990), 50 Cal.3d 1118, 1126, 270 Cal.Rptr. 1, 4, 791 P.2d 587, 590; *Am. Med. Internatl., Inc. v. Giurintano* (Tex.App.1991), 821 S.W.2d 331, 335. A plaintiff is entitled to restitution for any pecuniary loss which naturally and proximately results from such intentional misconduct. *Louis Kamm, Inc. v. Flink* (N.J.1934), 175 A. 62, 66. It must be observed, however, that *actual* damages are required. *Richland Natl. Bank & Trust v. Swenson* (1991), 249 Mont. 410, 418, 816 P.2d 1045, 1051; *Galloway v. Travelers Ins.* Co. (Miss.1987), 515 So.2d 678, 682–683. The law simply does not allow recovery for innocuous or unsuccessful interference. *Am. Med. Internatl., Inc. v. Scheller* (Fla.App.1984), 462 So.2d 1, 9.

Furthermore, we will not judicially engraft Safety–Kleen's "formal relationship" requirement onto the statutory proscription against deceptive trade practices. To warrant "actual damages," the plaintiff need only establish a disparagement of his "business" as a proximate result of false representations of fact by another made in the course of his own business, vocation, or occupation. R.C. 4165.02(H) and 4165.03. Since this enactment is unequivocal in this respect, it may not be construed in any manner other than what its plain terms indicate. See *Kneisley v. Lattimer–Stevens Co.* (1988), 40 Ohio St.3d 354, 357, 533 N.E.2d 743, 746.

We must still consider whether findings in favor of Akron–Canton Waste upon the dual claims of business interference and deceptive trade practices were warranted by the record. The jury's verdict will not be overturned so long as each essential element is supported by at least some competent, credible evidence. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus.

Testimony was supplied on the issue of actual damages by Donald French, a manager of a Quaker State Minit–Lube in Akron. During November 1988, his facility's waste oil was collected by Safety–Kleen. Akron–Canton Waste offered a better deal to French, prompting him to change services. French was then approached by a Safety–Kleen driver, Richard Duke ("Duke"), who showed him copies of the theft reports and accused Akron–Canton Waste of "stealing used motor oil." French relayed this information to his area manager, Brian DelCampo. It had been DelCampo's intention to recommend to all his Akron area managers that they begin to utilize Akron–Canton Waste.

Kaiser contacted DelCampo on December 19, 1988 in an attempt to regain the Minit–Lube business for Safety–Kleen. Kaiser told DelCampo that "Akron–Canton Waste Oil was guilty of theft on other vendors." He sent copies of the police reports to DelCampo in an attempt to back up his accusations. DelCampo became very concerned with Akron–Canton Waste's reliability and his own company's potential liability. He disseminated the information to his local managers at their next meeting. According to French, DelCampo "strongly suggested" that they "discontinue using Akron–Canton Waste Oil." Several managers did so immediately. DelCampo was replaced by a new area manager shortly thereafter who installed Safety–Kleen as Quaker State Minit–Lube's exclusive waste oil collector.

While it was, of course, impossible for Akron–Canton Waste to definitively establish a specific amount of lost profits due to Safety–Kleen's conduct, there certainly was at least some competent, credible proof to support the jury's verdict. Actual damages to Akron–Canton Waste's business relationship with Quaker State Minit–Lube could be reasonably discerned from the testimony presented. While some evidence was presented to the contrary, determinations of weight and credibility are properly left to the trier of fact. *Len Ran, Inc. v. Mellott* (1990), 63 Ohio App.3d 123, 127, 577 N.E.2d 1185, 1187. The common pleas judge did not err by allowing the jurors to decide whether Akron–Canton Waste was entitled to relief under theories of common-law interference with business relations and statutory deceptive trade practices.

This assignment of error is not well taken.

### K–Mart Assignments of Error

"I. The trial court erred in failing to direct a verdict in favor of the defendant-appellant, K–Mart, on the issue of qualified privilege.

"A. It is a question of law for the trial court to determine the existence of a qualified privilege.

"B. Reasonable minds could only conclude that K–Mart's statements were cloaked with a qualified privilege.

"C. Reasonable minds could only conclude that the appellees did not defeat K–Mart's qualified privilege by clear and convincing proof of actual malice.

"II. The jury's verdict in favor of the appellees on the issue of defamation is against the manifest weight of the evidence."

The essential elements of the common-law action of defamation, which includes both libel and slander, have been set forth as:

"(a) a false and defamatory statement concerning another;

"(b) an unprivileged publication to a third party;

"(c) fault amounting at least to negligence on the part of the publisher; and

"(d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." 3 Restatement of the Law 2d, Torts (1977) 155, Section 558.

In regard to this final requirement, a publication is actionable *per se* and special harm need not be shown if it consists of: (1) written statements which falsely charge the plaintiff with the commission of a crime, or (2) oral declarations which falsely charge the plaintiff with the commission of a crime involving moral turpitude which subjects the offender to infamous punishment. *State v. Smily* (1881), 37 Ohio St. 30; see 35 Ohio Jurisprudence 3d (1982) 456, Defamation and Privacy, Section 9.

K–Mart's principal argument at trial was that any statements it made concerning Akron–Canton Waste were privileged. On appeal, K–Mart initially contends that all determinations in this regard should have been made by the judge and not the jury.

Properly understood, the existence of a privilege to make an otherwise defamatory statement, whether absolute or conditional, is a mixed question of law and fact. An examination of the circumstances surrounding the pertinent communication is always required. Genuine disputes over material facts must be resolved by the jury. *Post Publishing Co. v. Moloney* (1893), 50 Ohio St. 71, 33 N.E. 921, paragraph two of the syllabus; *Fawcett v. G.C. Murphy & Co.* (1976), 46 Ohio St.2d 245, 255, 75 O.O.2d 291, 296, 348 N.E.2d 144, 150; accord *Saunders v. VanPelt* (Me.1985), 497 A.2d 1121, 1125; *Pickering v. Frink* (1983), 123 N.H. 326, 328, 461 A.2d 117, 119. "It is for the court, however, to decide whether the facts found by the jury made the publication privileged or to instruct the jury as to what facts they must find in order to hold the publication privileged." Restatement, *supra*, at Section 619, Comment *a*.

Upon review, determinations of historical fact will be reversed only if unsupported by any competent, credible evidence. *C.E. Morris, supra.* Conversely, issues of law will be examined *de novo.* See, generally, *Adkins v. Stow City School Dist. Bd. of Edn.* (1990), 70 Ohio App.3d 532, 535–536, 591 N.E.2d 795, 796–797.

The common pleas judge recognized in the case *sub judice* that one may enjoy a qualified privilege to reveal disparaging information about another where a moral or social obligation requires such disclosure. *Hahn v. Kotten* (1975), 43 Ohio St.2d 237, 243–248, 72 O.O.2d 134, 137–140, 331 N.E.2d 713, 718–720. Accordingly, he instructed the jurors that if they found that K–Mart had made the disparaging statements in a good faith effort to (1) report a crime to the proper authorities, and (2) alert Safety–Kleen to possible improper disposal of waste oil by a competitor, then there could be no liability for defamation. By all appearances, the judge and jury both performed their appropriate function.

K–Mart further insists that rational minds could not find in favor of Akron–Canton Waste on this issue. The jurors' interrogatory responses revealed that they were convinced that any privileges enjoyed by K–Mart were abused. The Ohio Supreme Court explained in *Jacobs v. Frank* (1991), 60 Ohio St.3d 111, 573 N.E.2d 609, paragraph two of the syllabus, that:

"When a defendant possesses a qualified privilege regarding statements contained in a published communication, that privilege can be defeated only by a clear and convincing showing that the communication was made with actual malice. In a qualified privilege case, 'actual malice' is defined as acting with knowledge that the statements are false or acting with reckless disregard as to their truth or falsity."

The trial judge duly instructed the jurors on the heightened "clear and convincing" standard. The question before this court is whether sufficient competent, credible evidence was presented to meet this requisite degree of proof. *State v. Schiebel* (1990), 55 Ohio St.3d 71, 74, 564 N.E.2d 54, 60.

The report K–Mart filed with the police and then disseminated to Safety–Kleen accused Akron–Canton Waste of taking used oil without "permission" and charged that the collector was "not licensed by the EPA [Environmental Protection Agency]." The jury could properly find that neither allegation was correct. Ambach testified that he was given "permission" to pump the oil by a mechanic. At the time, both the uniform he was wearing and the truck he was driving bore the Akron–Canton Waste name. The mechanic took the receipt to his assistant store manager when Ambach was finished. Gunner confirmed both that he signed the Akron–Canton Waste receipt and that he had authority from K–Mart to do so. Ambach explained that he left a copy of

the receipt at the store and went on his way. Uncontroverted evidence was further presented that Akron–Canton Waste had indeed registered with the EPA in 1987.

 It is well settled in Ohio that information obtained by agents within the scope of their authority during the transaction of a corporate principal's business "become at once the knowledge of the corporation without any actual or presumptive communication from agent to principal." *First Natl. Bank of New Bremen v. Burns* (1913), 88 Ohio St. 434, 103 N.E. 93, paragraph two of the syllabus; see, also, 12 Ohio Jurisprudence 3d (1979) 137, Business Relationships, Section 475. Given the evidence presented, reasonable minds could conclude—even under the clear and convincing standard—that Gunner and the unidentified mechanic were both aware that Akron–Canton Waste *had* received "permission" to collect the waste oil and that such knowledge was attributable to K–Mart. The testimony strongly suggested that these two employees directly received this information as a result and in the course of their duties to the store. Communications made with the knowledge of their untruthfulness cannot be privileged. *Jacobs, supra.*

Additionally, the jurors could still find the requisite degree of "actual malice" irrespective of what K–Mart knew. The loss prevention manager, Smith, conceded that she was not at K–Mart the day the waste oil was taken. Before telephoning the police after she returned to work, Smith spoke with the automotive manager, but he also had not been present at the pertinent time. Although she did claim to have "talked to several employees," Smith apparently neglected to interview anyone who had dealt directly with Ambach, including assistant store manager Gunner. Smith nevertheless proceeded to lodge the theft complaint with the police.

As already noted, the K–Mart complaint further charged, without any foundation whatsoever, that Akron–Canton Waste was not licensed by the EPA. Smith denied having made such a comment. Nevertheless, the jurors could reasonably conclude that the New Philadelphia Police Department did not fabricate this accusation, as K–Mart seemed to suggest. One could view Smith's testimony as self-serving to a large extent. *Len Ran, Inc., supra.*

The record therefore supports a finding, based upon clear and convincing evidence, that K–Mart acted "with reckless disregard" when it falsely accused Akron–Canton Waste of (1) taking used oil without permission, and (2) not being registered with the EPA. Again, a privilege to disseminate otherwise defamatory information cannot be exercised in such instances. *Jacobs, supra.*

These assignments of error are not well taken.

"The trial court erred in permitting the plaintiffs' claims for libel and slander to go to the jury."

 Safety–Kleen contends that it also could not be found liable for defamation under the circumstances. We are initially advised that the company enjoyed a privilege to warn potential customers of the existence of the theft reports. *Hahn, supra.* Perhaps if Safety–Kleen had limited itself to such benign activities we might agree. At trial, however, Dominic Dinardo of 15 Minute Lube recalled that Duke showed him the reports and told him Ambach "was a thief." Brian DelCampo of Minit–Lube similarly explained that Kaiser informed him that "Akron–Canton Waste Oil was guilty of theft on other vendors." Duke stated to French that Akron–Canton Waste was "stealing used motor oil" and showed him the police reports. Robert Johnson, a manager at Texas Ten Minute Oil and Lube, was advised by a Safety–Kleen sales representative that Akron–Canton Waste "had stolen oil" and that Ambach "did not have an EPA license."

A privilege to repeat otherwise defamatory statements must, among other things, be limited in scope to the purpose to be served by the privilege and made in the proper manner. *Hahn, supra,* 43 Ohio St.2d at 244, 72 O.O.2d at 138, 331 N.E.2d at 718; *Jacobs, supra,* 60 Ohio St.3d at 114, 573 N.E.2d at 612. While Safety–Kleen might have had a right to disclose to potential customers that criminal allegations had been made against a competitor, but it is quite another thing to call someone a "thief." Reasonable minds could find that such unwarranted embellishment was intended to create the impression that the charges had been proven in an appropriate forum and were now established facts. The police reports Safety–Kleen is attempting to use as a shield suggest no such thing.

 Safety–Kleen further argues that any improper remarks its employees made were directed to the entity Akron–Canton Waste Oil Company, Inc. and not Ambach personally, thereby precluding a separate award for the latter. This assessment does not square with Duke's accusation of thievery which was leveled specifically at Ambach. The Firestone report which was provided in conjunction with these comments identified the supposed perpetrator as "Fred." Moreover, testimony was presented that Ambach was the dominant figure controlling Akron–Canton Waste. Charges against the business could logically be construed as charges against the person as well. Separate verdicts for both therefore were justified.

This assignment of error is overruled.

Safety–Kleen Assignment of Error IV

"The trial court committed prejudicial error as a matter of law in allowing claims of negligent and intentional infliction of severe emotional distress to go to the jury where there was no evidence of the necessary [*sic*] severe and debilitating emotional effect."

K–Mart Assignments of Error

"III. The trial court erred in overruling K–Mart's motion for a directed verdict on the issue of emotional distress.

"A. the record is devoid of any evidence that appellee Ambach suffered serious emotional distress."

"IV. The jury's verdict against K–Mart on the issue of negligent infliction of emotional distress is against the manifest weight of the evidence."

At the close of all the evidence, Safety–Kleen and K–Mart both renewed motions for directed verdicts, Civ.R. 50(A), upon the claims of intentional and negligent infliction of emotional distress. Both applications were denied. Upon review, this court must determine whether the evidence was such that reasonable minds could only find in favor of the defendants on these issues. *Helmick v. Republic–Franklin Ins. Co.* (1988), 39 Ohio St.3d 71, 74–75, 529 N.E.2d 464, 467–468.

Safety–Kleen and K–Mart have focused their arguments upon the degree of harm Ambach allegedly suffered. The common-law torts of negligent and intentional infliction of emotional distress both require a serious and debilitating injury. *Paugh v. Hanks* (1983), 6 Ohio St.3d 72, 77–78, 6 OBR 114, 118–119, 451 N.E.2d 759, 764–765; *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 374, 6 OBR 421, 425, 453 N.E.2d 666, 670. As stated in 1 Restatement of the Law 2d, Torts (1965) 77, Section 46, Comment *j:*

" * * * Complete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. * * * " See *Pyle v. Pyle* (1983), 11 Ohio App.3d 31, 34, 11 OBR 63, 66, 463 N.E.2d 98, 103.

Ambach testified that when he discovered that Firestone had filed a complaint against him, he was "totally dumbfounded" and could not operate his business "for a couple days." His wife described him as "upset" and "mean." He was able, however, to consult with an attorney.

Ambach further claimed that he was again "dumbfounded" when he later discovered the K–Mart police report. He "slowed down" his business and put

off phone calls for two or three days. His wife claimed that her husband was "confused" and "mean" as a result. According to her, their son became disenchanted with Ambach and eventually declined to join the family business. After giving the matter some thought, Ambach decided to fight back.

All things considered, we are convinced that this evidence, as a matter of law, falls well short of that required to warrant judicial relief for infliction of emotional distress. No suggestion was made that Ambach's understandable anxiety was so serious and persistent as to be intolerable. Both his and his wife's accounts of his demeanor were, relatively speaking, ordinary. Neither firmly stated that any of the effects observed were long-term. While expert testimony is not essential to a claim of infliction of emotional distress, *Paugh, supra,* 6 Ohio St.3d at 80, 6 OBR at 121, 451 N.E.2d at 766; *Uebelacker v. Cincom Systems, Inc.* (1988), 48 Ohio App.3d 268, 276, 549 N.E.2d 1210, 1219, no independent evaluations or assessments were offered to support Ambach's claims.

These three assignments of error are sustained.

### Safety–Kleen Assignment of Error III

"The trial court erred in the submission of punitive damages to the jury."

Since earliest times, juries in Ohio have been permitted to award punitive damages when malice has been shown. *Roberts v. Mason* (1859), 10 Ohio St. 277, paragraph one of the syllabus. The court clarified in the syllabus of *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174, that:

"Actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, *or* (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." (Emphasis *sic.*) See, also, *Calmes v. Goodyear Tire & Rubber Co.* (1991), 61 Ohio St.3d 470, 473, 575 N.E.2d 416, 419.

■ Safety–Kleen's first argument is that insufficient evidence was presented to support a finding of actual malice. We have already detailed the extensive testimony which revealed a continuous policy of encouraging waste generators to file theft reports, distributing copies to sales representatives, disseminating the documents to potential customers, and embellishing upon the reports with unfounded accusations of criminal conduct. Perhaps most illuminating of all was former employee Robin Johnston's disclosures concerning her superiors' intentions to discredit Safety–Kleen's competitors by means of these tactics. The trial judge properly allowed the jurors to determine the issue of actual malice and the verdict returned is, likewise, supported by the record.

██ Safety–Kleen's second contention addresses the manner in which punitive damages were calculated. Prior to January 5, 1988, the law in Ohio was clear that both the appropriateness and amount of such awards were questions for the jury. *Mason, supra; Villella v. Waikem Motors, Inc.* (1989), 45 Ohio St.3d 36, 40, 543 N.E.2d 464, 468. On that date, R.C. 2315.21 went into effect. Under this enactment, the trier of fact is still the determiner of liability for punitive damages, but the sum allotted is to be assessed by the court. R.C. 2315.21(C)(1) and (2).

By the express declaration of R.C. 1.48, statutes are "presumed to be prospective." Section 3(A) of the bill provides that R.C. 2315.21 " * * * shall apply only to tort or other civil actions that are commenced on and after the effective date of this act and that are based upon claims for relief that arise on or after that date, and only to tortious conduct that occurs on or after that date." Am.Sub.H.B. No. 1 (142 Ohio Laws, Part I, 1661, 1751–1752). Since Akron–Canton Waste filed its lawsuit well past January 5, 1988, the statute applies unless (1) the claims warranting punitive damages arose, *or* (2) the conduct alleged occurred, before that date.

██ Applying this analysis to K–Mart presents no great difficulty. Akron–Canton Waste's problems with the store did not begin until August 18, 1988 when Ambach removed the waste oil, prompting the filing of the police report. The claims underlying the request for punitive damages against K–Mart arose and the conduct alleged occurred after R.C. 2315.21 took effect. The bifurcated format was therefore required.

The situation with Safety–Kleen, Kaiser, and Duke is more complicated. Johnston testified that during her tenure with the corporation from April 1987 through June 1989, upper level management continued to employ the tactic of encouraging waste oil generators to file theft reports against competitors and then disseminating copies to potential customers. Kaiser specifically preserved this policy when he assumed control in late 1987. In December 1987, Duke confronted the 15 Minute Lube manager, Dinardo, with his deceptive sales pitch. A few weeks later, R.C. 2315.21 took effect. During December 1988, Duke advised French of the supposed thievery. Kaiser contacted French's superior, DelCampo, and reiterated these false accusations.

Section 3 of the bill is unclear as to whether the bifurcated format applies to claims, such as those before us, rooted in conduct occurring both before and after the effective date. In attempting to discern the intentions of the General Assembly, this court must examine the language employed and the purpose to be accomplished. *State ex rel. Francis v. Sours* (1944), 143 Ohio St. 120, 124, 28 O.O. 53, 55, 53 N.E.2d 1021, 1023. A strong presumption exists against any construction which produces unreasonable or absurd conse-

quences. R.C. 1.47(C); see *Canton v. Imperial Bowling Lanes, Inc.* (1968), 16 Ohio St.2d 47, 45 O.O.2d 327, 242 N.E.2d 566, paragraph four of the syllabus; *State ex rel. Belknap v. Lavelle* (1985), 18 Ohio St.3d 180, 181–182, 18 OBR 248, 248–249, 480 N.E.2d 758, 759–760. Accordingly, the Ohio Supreme Court declared in *Gulf Oil Corp. v. Kosydar* (1975), 44 Ohio St.2d 208, 73 O.O.2d 507, 339 N.E.2d 820, paragraph two of the syllabus, that:

"If the construction and interpretation of statutory language reveals the statute to be facially ambiguous, it is the function of the courts to construe the statutory language to effect a just and reasonable result."

The trial judge accepted Akron–Canton Waste's approach, which was to treat the entire course of tortious conduct as a single uninterrupted episode. Viewed holistically, neither the underlying claims arose, nor the alleged conduct occurred, entirely "on or after" January 5, 1988. This analysis is consistent with the reasoning advanced by the Ohio Supreme Court in *Digital & Analog Design Corp. v. N. Supply Co.* (1989), 44 Ohio St.3d 36, 540 N.E.2d 1358 ("*Digital I*"). The justices held that a civil plaintiff could not break up events governed by a "single animus" in an attempt to secure multiple punitive damage awards, even though the defendant might, in theory, be individually liable for each episode. *Id.* at syllabus. In the case presently before us, a continuous scheme was established which followed a well-defined pattern and was motivated by a single, discrete objective. Safety–Kleen, Kaiser, and Duke were therefore each subject to R.C. 2315.21.

Safety–Kleen does not suggest that a more reasonable alternative to this interpretation exists. Applying the statute, even though intertwined claims arose and conduct occurred prior to its effective date, would violate the presumption against retrospective laws and could possibly create constitutional infirmities.

Safety–Kleen complains that prejudice resulted from the differential treatment of it and K–Mart. No attempt is made, however, to explain in concrete and pragmatic terms why the verdict was tainted by these proceedings. Quite obviously, the General Assembly's change in the law required in this particular case that the jury determine the amount of punitive damages to be levied against Safety–Kleen, Kaiser, and Duke while the court would calculate such an amount for K–Mart. Safety–Kleen does not suggest that this natural consequence of the legislative reform is somehow constitutionally precluded.

This assignment of error lacks merit.

### Safety–Kleen Assignment of Error I

"The trial court committed prejudicial error in improperly permitting the jury to hear and consider evidence of attorney fees and in rendering judgment

on a verdict that awarded attorneys fees in excess of any amount in evidence."

Safety–Kleen's principal contention is that the trial judge was barred, as a matter of law, from submitting the determination of attorney fees to the jury. The day after oral arguments were conducted in this appeal, the Supreme Court of Ohio rejected this reasoning in *Digital & Analog Design Corp. v. N. Supply Co.* (1992), 63 Ohio St.3d 657, 590 N.E.2d 737 ("*Digital II*"). Safety–Kleen has tendered a supplemental brief advancing several dubious theories as to why we should not abide by this most recent pronouncement.

Paragraph three of the syllabus of *Digital II* flatly declares, in part, that:

" * * * [A] trial court must submit to a jury the issue of whether attorney fees should be awarded in a tort action. The amount of those fees, however, shall be determined by the trial judge, who may, in his or her discretion, submit the question of the amount of the fees to the jury."

Safety–Kleen insists this holding is mere dicta. However, this court has no authority to ignore an unambiguous directive set forth in a Supreme Court syllabus. *Smith v. Klem* (1983), 6 Ohio St.3d 16, 18, 6 OBR 13, 15, 450 N.E.2d 1171, 1173.

Safety–Kleen seizes upon footnote four of the opinion which suggests that the most economical format would be to allow the jury to assess the amount of attorney fees in a separate proceeding after liability has been determined. *Digital II, supra,* at 665, 590 N.E.2d at 744. The court, however, conspicuously refrained from mandating this bifurcated approach in all instances. We will not reverse the common pleas judge for failing to utilize the most expedient procedures available. Judicial economy would hardly be served by yet another trial.

Safety–Kleen does note that the trial judge never journalized the jurors' express allowance of attorney fees in the final entry of June 25, 1990. Since this case is to be remanded in any event on other grounds, we will allow the court an opportunity to clarify this issue.

Finally, Safety–Kleen maintains that the jury's allotment for attorney fees, as set forth in the interrogatories, was excessive. Given that we are not exactly sure what, if anything, was awarded, this contention is premature.

This assignment of error is overruled.

### Safety–Kleen Assignment of Error VII

"The trial court committed prejudicial err [*sic* ] by interjecting itself in an adversarial manner to the defendants' detriment."

Safety–Kleen complains that the common pleas judge unfairly questioned witnesses during the course of the proceedings. Obviously, such participation must be "scrupulously limited" so as not to unjustifiably sway the jurors. *State ex rel. Wise v. Chand* (1970), 21 Ohio St.2d 113, 50 O.O.2d 322, 256 N.E.2d 613, paragraph three of the syllabus. Nevertheless, the trial judge has a duty to see that the truth is developed and should not hesitate to pose a proper, pertinent, and even-handed question when justice requires. Evid.R. 614(B); *Jenkins v. Clark* (1982), 7 Ohio App.3d 93, 97–98, 7 OBR 124, 128–129, 454 N.E.2d 541, 546–548.

Of the approximately one thousand one hundred pages of typed transcript, Safety–Kleen has identified four instances of supposedly improper interference. We have reviewed these passages and are still convinced that Safety–Kleen received a fair trial. On each occasion, it appears that the attorneys lost sight of the true purpose of the proceedings—uncovering the truth—thereby warranting judicial intercession.

This assignment of error is overruled.

## Safety–Kleen Assignment of Error IX

"It was plain error for the court to permit the jury to return special, rather than general verdicts."

This assignment of error is meritless as the record confirms that general verdicts were duly returned by the jury in full compliance with Civ.R. 49(A).

## Safety–Kleen Assignment of Error VIII

"The court erred in failing to grant a new trial when the total award was a result of passion and prejudice."

A jury verdict must be set aside if the surrounding facts and circumstances establish that the award was the result of passion and prejudice. *Toledo, Columbus & Ohio River RR. Co. v. Miller* (1923), 108 Ohio St. 388, 140 N.E. 617, paragraph three of the syllabus. "In light of the trial court's unique opportunity to view the conduct of counsel, behavior of the jurors, and course of the proceedings in general, considerable discretion is afforded to determinations of this nature." *Cox v. Deppisch* (Sept. 25, 1991), Summit App. No. 15033, unreported, at 7, 1991 WL 191758.

In arguing that the judge erred by refusing to grant its motion for a new trial, Safety–Kleen first points to the size of the award. A substantial apportionment of damages, however, is not conclusive evidence of juror

passion and prejudice. *Fromson & Davis Co. v. Reider* (1934), 127 Ohio St. 564, 568, 189 N.E. 851, 852.

Safety–Kleen asserts that the jurors were necessarily inflamed by Akron–Canton Waste's attempts to characterize the company as a corporate Goliath. Of the four examples cited, three did not precipitate an objection. More important, none of these remarks appears to have been untrue or misleading. Since sufficient evidence was presented to allow the jurors to consider punitive damages, Safety–Kleen's financial status was directly at issue. *Book v. Erskine & Sons, Inc.* (1951), 154 Ohio St. 391, 399, 43 O.O. 334, 337, 96 N.E.2d 289, 293.

As further indications of the jurors' supposed passion and prejudice, Safety–Kleen reiterates its positions raised in the preceding assignments of error. We have already concluded that the trial judge did not err in his treatment of these matters.

Accordingly, this final assignment of error is also overruled.

The awards for negligent and intentional infliction of emotional distress are vacated and these claims are dismissed. This case is remanded for a redetermination of damages, including attorney fees, if appropriate. In all other respects, the judgment of the court of common pleas is affirmed.

*Judgment accordingly.*

QUILLIN and COOK, JJ., concur.