DECISION AND JOURNAL ENTRY
 INTRODUCTION {¶ 1} April Couch, in her capacity as the Administratrix of the Estate of her mother, Lurene Hall, sued various medical providers she believes negligently caused Ms. Hall's death during a surgical procedure. The case went to trial, and the jury rendered a defense verdict. Ms. Couch has appealed, arguing that the trial court: (1) incorrectly refused to allow Ms. Couch to call the county coroner as a rebuttal witness; (2) incorrectly refused to give the jury an instruction regarding res ipsa loquitur; and (3) incorrectly denied her motion for a new trial. This Court reverses and remands this case for a new trial because the trial court incorrectly refused to instruct the jury regarding res ipsa loquitur. *Page 2 
 FACTS {¶ 2} In order to accommodate Ms. Hall's frequent kidney dialysis treatments, Dr. Richard Patterson, an interventional radiologist, surgically implanted a catheter that ran from Ms. Hall's neck to the top of her heart. The procedure involved piercing the skin on the left side of her neck with a needle, inserting an introducer into the skin, and inserting a guide wire through the introducer down through the jugular vein into the superior vena cava and beyond. The next step is for progressively larger dilators to be slid along the guide wire. Dilators are small tapered instruments that are pushed through to open the passageway wider to accommodate larger items. Dr. Patterson testified it is critical that the dilators are slid along the guide wire because an unguided dilator advancing into the vein can cause damage to the vessel walls. This can occur if the guide wire is inadvertently pulled back while the doctor is advancing the dilators. Dr. Patterson was able to monitor the progression of the dilators during the procedure using fluoroscopy, a type of x-ray video camera equipment that projects a real-time image onto a monitor.
 {¶ 3} Soon after the procedure, Ms. Hall reported pain at the insertion site and was given pain medication. Dr. Patterson reported that, fifteen minutes later, Ms. Hall appeared "unresponsive," "lethargic," "cool," and "a little bit clammy." Dr. Patterson ordered her to be taken back to her hospital room and had her admitting doctor paged. Shortly thereafter, Ms. Hall died.
 {¶ 4} Her autopsy revealed a four-centimeter laceration of the wall of the superior vena cava, one of the major vessels that carries blood to the heart. All of the experts agreed that the cause of death was pericardial tamponade. This was described as a stopping of the heart caused by pressure due to blood leaking into the sac that surrounds the heart. At trial, everyone agreed *Page 3 
that the internal bleeding that killed Ms. Hall started during the catheter placement procedure performed by Dr. Patterson. The experts disagreed, however, on what caused that bleeding.
 {¶ 5} Ms. Couch's expert interventional radiologist, Dr. Michael Foley, testified that Dr. Patterson must have inadvertently pulled the guide wire back and advanced the dilator without it, causing the dilator to be pushed through the vessel wall. He based his opinion on the location of the injury and the rapid pace of Ms. Hall's decline and death following the procedure.
 {¶ 6} He further testified, that this type of injury does not occur in the ordinary course of events if the standard of care is followed. He first testified to that point on direct examination. On cross-examination, he testified that, if Dr. Patterson had actually followed the procedure Dr. Patterson claimed he had, "the perforation of the superior vena cava would not have occurred." He continued, "However, that couldn't have been what really happened in real life, because you would not have lacerated the superior vena cava if you did everything according to the way you said you did it. It wouldn't happen." He testified the laceration was evidence of trauma that he believed came from the unguided advancement of a dilator during this procedure.
 {¶ 7} Ms. Couch's lawyer asked Dr. Foley for his opinion regarding various defense theories of causation. Dr. Foley strongly disagreed with Dr. Patterson's experts. He testified that none of the alternative theories suggested by the defense experts described events that were likely to have caused Ms. Hall's injury. This included a defense theory that a flesh-eating staph infection had weakened the vessel.
 {¶ 8} Ms. Couch also called a vascular surgeon, Dr. Jeffrey Kremen, who offered his opinion, to a reasonable degree of medical certainty, "[t]hat the dilator that was used in some way got off course and produced the laceration that led to [the bleeding into the sac around Ms. Hall's heart] that led to [her death]." Dr. Kremen concluded that the laceration in Ms. Hall's *Page 4 
superior vena cava happened during the catheter placement procedure. He was asked about various defense theories regarding how the injury could have occurred in the absence of negligence. Dr. Kremen stated that he did not believe that any of the alternative theories, including an infection weakening the vessel, explained Ms. Hall's injury. He specifically testified that "there is probably no other conclusion you can draw than [that] the dilator, . . . probably caused the rather large injury, [that is] the rent in the wall. . . ."
 {¶ 9} Dr. Kremen testified that, in his opinion, based upon a reasonable degree of medical certainty, Ms. Hall's injury occurred under such circumstances that in the ordinary course of events it would not have occurred if ordinary care had been observed. He testified that, "if this procedure . . . goes according to protocol, this shouldn't happen. . . . [T]his is really something, if you are following . . . the rules, you shouldn't end up with a tear in the vena cava."
 {¶ 10} Dr. Patterson and his employer called an interventional nephrologist, Dr. Matt Leavitt, who testified that the laceration in the superior vena cava was the cause of Ms. Hall's death and that it occurred during the catheter placement procedure. He testified, however, that the laceration was likely the result of some unknown abnormality in the vessel. He was not able to point to anything in Ms. Hall's medical history indicating that she had any weakness in her blood vessels, but he testified that friction from the wire was the most likely cause of the injury. Dr. Leavitt further testified that friction does not normally cause this type of injury, so, according to him, Ms. Hall's injury was evidence that she was predisposed to such an injury.
 {¶ 11} Dr. Leavitt acknowledged that the guide wire can inadvertently come out during these procedures and that a dilator tip could cut the wall of a blood vessel. He also acknowledged that it would violate the standard of care to advance a dilator without the benefit *Page 5 
of a guide wire. He felt, however, that the possibility of the dilator advancing through the vessel wall to cause this injury was "just short of impossible."
 {¶ 12} Dr. Leavitt testified that Dr. Patterson "definitely met the standard of care." He testified that his opinion was based on the fact that Dr. Patterson's description of the procedure was "by the book," indicating that he was not negligent. He did admit on cross-examination, however, that had the procedure gone other than the way Dr. Patterson described, his opinion would have been different. He further testified that Ms. Couch's experts' opinions that Dr. Patterson advanced the dilator without the benefit of a guide wire is "unlikely as can be" because "[i]t is not something that an experienced operator would do" and because no other witness to the procedure testified that it had occurred.
 {¶ 13} Dr. Leavitt testified that bleeding, both internal and external, is a known risk of this procedure. Although, "not common complications, [ ] they do happen." He further testified that these complications can happen even when the procedure is done perfectly. He testified that the laceration of the superior vena cava is not in and of itself evidence of incompetence.
 {¶ 14} Dr. Patterson also called Dr. Mark Dean, an expert in interventional radiology. Dr. Dean testified that Dr. Patterson met the standard of care by performing a standard procedure in this case. He also admitted that his opinion was based on Dr. Patterson's description of his procedure and that his opinion would be different if Dr. Patterson's description had been otherwise. He testified, however, that a deviation from the standard of care is not the only way a superior vena cava laceration of this nature could occur.
 {¶ 15} Dr. Dean testified that Ms. Hall's injury was not the result of any instrument perforating the wall of the vein. He testified that the vein was weak because "the flesh-eating form of staph aureus" "was eating away . . . the lining of her blood vessel." He opined that the *Page 6 
mere stretching of the blood vessels, which was a necessary part of the procedure, caused the vessel to "unravel[ ]." When asked about his opinion of Ms. Couch's experts' theory that negligence caused this injury, Dr. Dean testified that he did not believe the dilator was long enough to reach the area of injury. He also testified that he warns his patients of several potential risks of the procedure including bleeding, infection, and death.
 {¶ 16} The trial court refused to give Ms. Couch's proffered jury instruction regarding res ipsa loquitur. The trial court ruled that the instruction was not appropriate because "there are multiple potential causative factors."
 RES IPSA LOQUITUR {¶ 17} Ms. Couch has argued that the trial court incorrectly refused to instruct the jury regarding the doctrine of res ipsa loquitur. "[R]es ipsa loquitur is a rule of evidence which permits the trier of fact to infer negligence on the part of the defendant from the circumstances surrounding the injury to plaintiff." Hake v. George Wiedemann BrewingCo., 23 Ohio St. 2d 65, 66 (1970). "The trier of fact is permitted, but not compelled, to find negligence." Morgan v. Children's Hosp.,18 Ohio St. 3d 185, 187 (1985). The doctrine does not shift the burden of proof from the plaintiff on any element. Id. (citing Prosser Keeton, Law of Torts § 40 (5th ed. 1985)). It simply provides a "method of proving the defendant's negligence through the use of circumstantial evidence."Id. (quoting Jennings Buick Inc. v. Cincinnati, 63 Ohio St. 2d 167,169-170 (1980)). "The weight of the inference of negligence which the jury is permitted to draw . . . as well as the weight of the explanation offered to meet such inference, is for the determination of the jury."Fink v. New York Cent. R.R. Co., 144 Ohio St. 1, at 12 (1944).
 {¶ 18} The doctrine "had its origin in the law of necessity."Fink, 144 Ohio St. at 5. "The particular justice of the doctrine rests upon the foundation that the true cause of the *Page 7 
occurrence whether innocent or culpable is within the knowledge or access of the defendant and not within the knowledge or access of the plaintiff." Id. Res ipsa loquitur, therefore, is often applied when someone "receives unusual injuries while unconscious and in the course of medical treatment" because in such cases the "cause [of the injury is] within the exclusive knowledge of the defendants." Becker v.Lake County Mem'l Hosp. W., 53 Ohio St. 3d 202, 205 (1990) (quotingYbarra v. Spangard, 154 P.2d 687, 690-691 (1944) and Kolakowski v.Voris, 415 N.E. 2d 397, 410 (1981)).
 {¶ 19} Res ipsa loquitur applies if the plaintiff produces evidence "(1) [t]hat the instrumentality causing the injury was, at the time of the injury, or at the time of creation of the condition causing the injury, under the exclusive management and control of the defendant; and (2) that the injury occurred under such circumstances that in the ordinary course of events it would not have occurred if ordinary care had been observed." Hake, 23 Ohio St. 2d at 66-67. "Whether sufficient evidence has been adduced at trial to warrant application of the rule is a question of law to be determined initially by the trial court, subject to review upon appeal." Id. at 67. Therefore, this Court must conduct a de novo review of a trial court's decision whether to instruct the jury about res ipsa loquitur. Akron-Canton Waste Oil Inc. v. Safety-Kleen OilServ. Inc., 81 Ohio App. 3d 591, 602 (1992).
 THE ORDINARY COURSE OF EVENTS {¶ 20} Dr. Patterson and his employer have not disputed that they had exclusive control of whichever instrumentalities caused the injury during the catheter placement procedure. They have argued, however, that the evidence before the trial court did not satisfy the second requirement for a res ipsa instruction: "that the injury occurred under such circumstances that in the ordinary course of events it would not have occurred if ordinary care had been observed." *Page 8 Hake, 23 Ohio St. 2d at 66-67. Dr. Patterson has argued that res ipsa loquitur should not be applied in this case because, according to him, the doctrine does not apply when there is expert medical testimony before the trial court suggesting an alternative theory explaining the injury. In this case, two expert witnesses for the defense testified that internal bleeding is a known risk of the procedure and, although uncommon, this type of injury can occur without negligence.
 {¶ 21} In effect, Dr. Patterson has argued that, even if Ms. Couch presented evidence that, if unrebutted, would have entitled her to an instruction on res ipsa loquitur, he successfully rebutted that evidence with the testimony of his experts and the trial court correctly concluded that she was not entitled to that instruction. As support for his argument, he has cited Jennings Buick v. Cincinnati,63 Ohio St. 2d 167 (1980), and this Court's opinion in Roberts v. Crow, 9th Dist. No. 22535, 2005-Ohio-6744.
 {¶ 22} Admittedly, the Supreme Court's opinion in Jennings includes language that seems to support Dr. Patterson's argument, language this Court quoted and relied on in Roberts: "Where it has been shown by the evidence adduced that there are two equally efficient and probable causes of the injury, one of which is not attributable to the negligence of the defendant, the rule of res ipsa loquitur does not apply."Jennings, 63 Ohio St. 2d at 171, quoted in Roberts, 2005-Ohio-6744, at ¶ 24. Unfortunately, the quoted language is broader than the facts inJennings support.
 {¶ 23} Jennings involved property damage caused by a bursting water main. The plaintiff theorized that the city had negligently backfilled the area after completing a repair, thus causing the pipe to burst. The plaintiff's own expert testified on cross-examination that the city's litany of other possible, non-negligent causes were "equally as probable" as that proposed by the plaintiff. Id. at 168. The reason the plaintiff in Jennings was not entitled to an instruction on res *Page 9 
ipsa loquitur was not that there was evidence that tended to show "two equally efficient and probable causes of the injury," it was because the only evidence before the trial court showed more than one "equally efficient and probable cause[ ] of the injury." Id. at 171. The plaintiff in Jennings failed to introduce evidence that satisfied the second requirement for a res ipsa loquitur instruction.
 {¶ 24} Five years after Jennings, the Ohio Supreme Court considered the application of res ipsa loquitur in the medical malpractice case ofMorgan v. Children's Hosp., 18 Ohio St. 3d 185, 187 (1985). InMorgan, a twelve-year-old boy never awoke following a surgical procedure and, at the time of trial, was in a persistent vegetative state. All experts agreed the boy had suffered brain damage caused by oxygen deprivation during surgery. The experts disagreed, however, regarding the cause of the deprivation. The plaintiffs' experts testified that it was caused by the defendant's failure to provide adequate ventilation during surgery. Id. at 186. The defendants' experts testified that the boy suffered from air emboli, that is, air bubbles that blocked the blood vessels carrying oxygen to the brain. Id.
 {¶ 25} The defendants in Morgan argued that, because they had presented an alternative, non-negligent explanation for the injury, the plaintiff was not entitled to an instruction on res ipsa loquitur.Id. at 189. The Supreme Court disagreed, pointing to the "well-established principle that a court may not refuse as a matter of law to instruct on the doctrine of res ipsa loquitur merely upon the basis that the defendant's evidence sufficiently rebuts the making of such an inference." Id. (citing Fink v. New York Cent. R.R. Co.,144 Ohio St. 1, paragraph three of the syllabus (1944) ("[A] trial court . . . is without authority to declare, as a matter of law, that the inference of negligence which the jury is permitted to draw, has been rebutted or destroyed by an explanation of the circumstances offered by the defendant, and such action . . . is an *Page 10 
invasion of the province of the jury."). The Supreme Court reversed inMorgan and remanded for a new trial.
 {¶ 26} The question in this case is not, as Dr. Patterson has argued, whether he produced evidence that there are reasonable, non-negligent potential causes of Ms. Hall's injury. The question is whether Ms. Couch produced evidence that the injury occurred under such circumstances that, in the ordinary course of events, it would not have occurred if Dr. Patterson had observed ordinary care. See Hake,23 Ohio St. 2d at 66-67.
 {¶ 27} In Jennings, the plaintiffs failed to present sufficient evidence for the application of the doctrine because their only expert agreed with the defense. On cross-examination, the plaintiff's expert testified that each of the defendants' proposed causes was "equally as probable" as the plaintiff's theory of negligence. SeeJennings, 63 Ohio St. 2d at 168. Thus, the plaintiff had failed to present evidence from which a jury could reasonably conclude that the negligence of the defendant was any more probable a cause of the injury than the non-negligent theories offered by the defendant. Seeid. at 171. In the same opinion, the Ohio Supreme Court wrote that, in order to apply res ipsa loquitur, a plaintiff is not required to disprove all non-negligent possible explanations for the injury. "[A] plaintiff . . . need not eliminate all reasonable non-negligent causes of [her] injury. It is sufficient if there is evidence from which reasonable men can believe that it is more probable than not that the injury was the proximate result of a negligent act or omission."Jennings, 63 Ohio St. 2d at 172; see also Gayheart v. Dayton Power Light Co., 98 Ohio App. 3d 220, 232 (1994). To the extent this Court held otherwise in Roberts v. Crow, 9th Dist. No. 22535, 2005-Ohio-6744, that holding is overruled.
 {¶ 28} In this case, Ms. Couch's experts testified to the standard of care for this procedure and further testified that, in the ordinary course of events, this type of injury does not *Page 11 
occur without negligence. They both testified that, in order to tear the wall of the superior vena cava, Dr. Patterson's guide wire must have been retracted when the third dilator was pushed into the vein. Despite the lack of direct evidence of the guide wire being retracted or the dilator actually piercing the wall of the blood vessel, Ms. Couch's experts unequivocally testified that the laceration to Ms. Hall's superior vena cava, more likely than not, resulted from Dr. Patterson's negligence during the procedure. Both experts further testified that it was unlikely that the laceration had been caused by any of the non-negligent explanations offered by Dr. Patterson's experts.
 {¶ 29} The defense experts testified that the laceration came from either a pre-existing flesh-eating bacteria or an unknown abnormality in the blood vessel. They also admitted, however, that their opinions were based on Dr. Patterson's testimony that the procedure went as planned.
 {¶ 30} Based on the evidence presented at trial, reasonable jurors could believe that it is more probable than not that Ms. Hall's injury was the proximate result of a negligent act or omission during the course of the catheter placement procedure. See Jennings,63 Ohio St. 2d at 172. Ms. Couch produced sufficient evidence, in the form of expert witness testimony, to show that, in the ordinary course of events, this type of injury does not occur without negligence. Dr. Foley, Ms. Couch's interventional radiology expert, unequivocally stated, several times and in various ways, that if the doctor is carefully advancing the dilators using a properly positioned guide wire, he will not tear the superior vena cava. Counter-evidence, including expert opinions regarding alternative, non-negligent causes, does not affect the trial court's determination of whether Ms. Couch has met the threshold requirements for an instruction on res ipsa loquitur. Ms. Couch was not required to "eliminate all reasonable non-negligent causes of [her] injury." *Page 12 
See Id. Requiring her to do so would invade the province of the jury. The trier of fact must weigh the evidence and decide which experts to believe.
 {¶ 31} As Ms. Couch's evidence met the requirements for her to be entitled to an instruction on res ipsa loquitur, the trial court should have instructed the jury that an inference of negligence was permissible. Ms. Couch's second assignment of error is sustained.
 REBUTTAL WITNESS {¶ 32} Ms. Couch's first assignment of error is that the trial court incorrectly refused to allow her to call the county coroner as a rebuttal witness. This Court's ruling on Ms. Couch's second assignment of error, however, requires the case to be reversed and remanded for a new trial. Therefore, this assignment of error is moot, and is overruled on that basis. See App. R. 12(A)(1)(c).
 MOTION FOR NEW TRIAL {¶ 33} Ms. Couch has argued that the trial court should have granted her motion for a new trial based on the cumulative effect of the errors alleged in her other arguments. Based on this Court's disposition of Ms. Couch's second assignment of error, this assignment of error is moot and is, therefore, overruled. See App. R. 12(A)(1)(c).
 CONCLUSION {¶ 34} The trial court should have instructed the jury on res ipsa loquitur because Ms. Couch's evidence met the requirements for application of the doctrine in this case. The judgment of the Summit County Court of Common Pleas is reversed and the cause is remanded to the trial court for further proceedings consistent with this opinion.
 Judgment reversed, and cause remanded. *Page 13 
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
Costs taxed to appellees.
Moore, P. J., Baird, J. concur.
(Baird, J., retired, of the Ninth District Court of Appeals, sitting by assignment pursuant to, § 6(C), Article IV, Constitution.) *Page 1